McCombs *v.* McCombs.

5-1046                               295 S. W. 2d 774

Opinion delivered December 3, 1956.

2

*Etheridge & Sawyer, DuVal L. Purkins,* and *D. A. Bradham,* for appellant.

*William S. Arnold* and *Williamson & Williamson,* for appellee.

J. SEABORN HOLT, Associate Justice. This litigation involves the ownership of 2,470.99 acres of farm lands in Ashley County. Appellants, A. P. McCombs and Eugenia McCombs, are husband and wife and A. P. McCombs was the brother of R. B. McCombs who died February 13, 1932. Appellee, Cleone R. McCombs, was the wife of R. B. McCombs. R. B. McCombs left surviving his widow, appellee, and two children, who have now reached their majority. At the time of R. B. McCombs' death he was heavily involved in debt and hopelessly insolvent, owing about $250,000. Appellee, as beneficiary, collected approximately $80,000 on life insurance of her husband. At the time of R. B. McCombs' death, A. P. McCombs was also heavily in debt and insolvent, owing approximately $75,000, and owned the lands here involved. The First National Bank of El Dorado, Arkansas, however, held a first mortgage against these lands for $42,863.03 and the R. B. McCombs' estate, held a second mortgage in the amount of $32,-899.07. The bank foreclosed its mortgage; was awarded a judgment for $42,863.03 and R. B. McCombs' estate was given a judgment for $32,899.07 on its second mortgage subject to the first mortgage of the bank. A sale of these lands was ordered and had. Cleone McCombs, appellee, was the purchaser at this sale for $20,000. The sale to her was duly confirmed by the trial court, a commissioner's deed (dated March 2, 1933) to her ordered, executed and approved, and appellee took possession of all these lands immediately thereafter in 1933 and has farmed, asserted and exercised ownership from 1933 to the present time, a period of some 23 years. Her deed was duly recorded. She has paid the taxes on this property each and every year following her purchase. She paid for the upkeep and repairs on the houses and barns on these lands. Each year since she acquired this property, A. P. McCombs, under a written recorded rental

contract with appellee, has farmed the property as her tenant and under the contract agreed to pay to her one-fourth of the cotton and one-third of the corn as rental.

The present suit was filed by A. P. McCombs and wife in which they sought specific performance of an alleged oral agreement or contract alleged to have been entered into between A. P. McCombs and appellee, Cleone R. McCombs, just prior to the purchase of the property by appellee at the foreclosure sale above. By this alleged agreement appellant claims that appellee agreed to buy the property at the foreclosure sale and to reconvey the legal title back to A. P. McCombs upon his repayment to her of his indebtedness due under the foreclosure decree through which appellee acquired title to the lands in question. On a trial, after an extended and patient hearing, the court found all the issues against appellants and dismissed their complaint for want of equity. This appeal followed.

For reversal appellants, in effect, first contend that the trial court erred in denying their prayer for specific performance of the alleged oral agreement, and second, that the court erred in refusing to hold, on the evidence presented, that a constructive trust resulted or was created under which appellant would be the beneficiary and in this connection appellant says: ". . . in cases where general rules and principles do not furnish an exact measure of justice between the parties, the court governs itself as far as it may by general rules and principles; but at the same time withholds and grants relief, according to the circumstances of each particular case. That is, upon the principle of constructive trust created by law." After a review of the record presented, we have concluded that the trial court was correct in denying both of appellants' contentions and in dismissing their complaint for want of equity.

Before appellants' contentions above could be sustained they have the very heavy burden imposed upon them of producing evidence to sustain these contentions that is clear, cogent and convincing and practically beyond a reasonable doubt. Our rule in a long line of cases

is to the following effect: ". . . we have many times held that a court of equity may grant specific performance of a parol contract to convey land only where the evidence of the agreement is clear, satisfactory and convincing. *McKie* v. *McClanahan,* 190 Ark. 41, 76 S. W. 2d 971; *Kranz* v. *Kranz,* 203 Ark. 1147, 158 S. W. 2d 926. The same rule of evidence holds true as to the establishment and enforcement of a constructive trust . . . Sometimes it is expressed that the 'evidence offered for this purpose must be of so positive a character as to leave no doubt of the fact,' and sometimes it is expressed as requiring the evidence to be 'full, clear and convincing' and sometimes expressed as requiring it to be 'clearly established' . . . Titles to real estate cannot be overturned by a bare preponderance of oral testimony seeking to establish a trust in opposition to written instruments. The conservatism of the courts has prevented the tenure of realty being based on such shifting sands." *McNutt* v. *Carnes,* 213 Ark. 346, 349 and 350, 210 S. W. 2d 290.

This court said in the case of *Walk* v. *Barrett,* 177 Ark. 265, 267, 6 S. W. (2d) 310, in the matter of a parol contract, "The rule of law applicable in such cases is that, before a court of equity may grant specific performance of a parol contract to convey lands, the evidence of such agreement must be clear, satisfactory and convincing. It must be so strong as to be substantially beyond reasonable doubt." In *Ripley* v. *Kelly,* 207 Ark. 1011, 183 S. W. 2d 793, we said: "It is a well settled principle that, while trusts resulting by operation of law may be proved by parol evidence, yet the courts uniformly require that such evidence be received with great caution, and that it be full, free and convincing." Here, in addition to the above evidence, appellee stoutly denied that any agreement such as appellant claims was ever entered into between her and A. P. McCombs at any time. A. P. McCombs testified that the alleged agreement was entered into in December 1933 at appellee's home in Little Rock, Arkansas. It appears that no witnesses were present. In each of the yearly recorded rental contracts which A. P. McCombs entered into with

appellee, he admitted her ownership of the property and that he was occupying as her tenant, in other words, the relationship of landlord and tenant clearly existed. In his income tax returns it appears that A. P. McCombs credited himself under deductions with one-fourth cotton paid to Cleone McCombs on lands involved and continued to make similar deductible claims through the years of his tenancy. He showed no deductions for depreciation for farm houses and barns from 1936 through 1952. Without attempting to detail more of the testimony we have concluded that appellants have fallen far short of meeting the burden of proof imposed upon them to sustain either of their contentions. Appellants' actions here speak much louder than their words.

Courts are reluctant when, as here, there is sought to be impressed upon the lands involved (which lands were conveyed to appellee by a solemn deed) a trust, especially after the intervention of more than twenty years. We said in *Griffin* v. *Griffin,* 200 Ark. 794, 141 S. W. 2d 16: "In the well considered case of *Davidson* v. *Edwards,* 168 Ark. 306, 270 S. W. 94, Justice HART said that the misrepresentation which will create a trust must be made before or at the time the legal title is acquired by the promisor, so that if the deed of January 2, 1905, did not create a trust, the subsequent promise of Marvin to convey his sister 20 acres of the land did not create one. Courts are reluctant — and should be — to impress trusts upon lands conveyed by deeds absolute in form, especially, where, as in this case, many years have intervened before that attempt is made, and will not do so in such case, or, for that matter, in any case, unless the testimony tending to establish the trust is clear, satisfactory and convincing, as we said to be necessary in the Armstrong case, *supra.* (*Armstrong* v. *Armstrong,* 181 Ark. 597, 27 S. W. 2d 88). We have many cases to this effect, the latest being that of *Maloch* v. *Pryor,* 200 Ark. 380, 139 S. W. 2d 51." A constructive trust (which appellant claims existed here and under which A. P. McCombs would be the beneficiary) can arise only by reason of a fraudulent misrepresentation

or action before or at the time the legal title is acquired by the alleged promisor (appellee here).

Finally, appellants say that they ". . . are entitled to relief because R. E. Wiley, who represented appellee and other adverse parties to appellants' interests in the 1932-33 foreclosure suit, also, assumed to and did act as attorney for appellants in that suit and failed to legally and equitably protect their right of redemption." In effect, appellants charge that Mr. R. E. Wiley (now deceased) represented A. P. McCombs and appellee, Cleone R. McCombs, in the bank foreclosure suit above (1932-1933) and therefore represented conflicting interests. We find that the great preponderance of the evidence in this case is against this contention. Mr. Wiley, a highly respected attorney at the bar of this court, represented appellee in the foreclosure proceedings and appellant testified positively that in the foreclosure suit he was "advised and assisted" by Mr. G. C. Ledbetter, an attorney of Hamburg and that Mr. Ledbetter was his attorney in the foreclosure suit. Throughout A. P. Mc-Combs' testimony he refers to Mr. Wiley as "the attorney for Cleone and my brother's estate (meaning R. B. McCombs' estate)." It appears that he had only one conference with Mr. Wiley and as to it says: "I decided to go up to Little Rock and talk with Mr. Wiley because I knew he was my brother's attorney and he was looking after my sister-in-law's affairs and her children and I knew he was the one to go to talk to." He learned from Mr. Wiley that appellee "was going to buy this debt of the First National Bank for forty thousand dollars." He says that Mr. Wiley, an attorney for Mrs. Cleone Mc-Combs and the R. B. McCombs estate, said that he had talked with Mr. Loughborough as attorney for Mrs. Hardy (who was involved in the foreclosure suit and not a party here) and that "they" (Mr. Loughborough and Mr. Wiley) "would try to work out a plan together that would protect my lands and give me a chance to redeem my lands and if I would cooperate with them, that they felt like that they both would assure me with this cooperation that I would get protection and have a chance to

redeem my three places, the Dean, Files and Wimberly places.''

Appellee testified positively that she had not authorized Mr. Wiley to make any such agreement, and we think the great preponderance of the testimony supports her, and further, that the evidence shows that Mr. Wiley made no such agreement with appellant. The law is well settled that an attorney, as here, employed to conduct litigation involving property, has no implied or apparent authority by reason of his employment, to bind his client in regard to the subject matter of the litigation except with respect to matters of procedure. In *Cullin-McCurdy Const. Co.* v. *Vulcan Iron Works,* 93 Ark. 342, 124 S. W. 1023, we said: ''There was no testimony offered to show that (attorney) Denman had any authority to act for appellee, further than to prosecute the suit as an attorney, and it was not within the scope of his authority as attorney to compromise with appellant, or to release the latter from liability or to forfeit that liability by making a new contract with another to assume it.'' ''It is a general principal that an attorney cannot by virtue of his general authority as attorney, bind his client by any act which amounts to a surrender or waiver in whole or in part of any substantial right of the client, . . .'' 5 Am. Jur., § 70, p. 300. ''The implied authority of an attorney to make stipulations is ordinarily limited to matters of procedure in the management or prosecution of the action. He cannot without special authority dispose of or adjust the substantial rights of his client by compromise or otherwise,'' 132 Am. State Reports, p. 156. ''An attorney employed under a general retainer cannot waive any of the substantial rights of his client without the latter's consent, nor make any executory contract in relation to his client's rights, nor in general, compromise them by any voluntary act of his own,'' Anno. 76 A. L. R. p. 1461.

On the whole case, finding no error, the decree is affirmed.